UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------- X

UNITED STATES OF AMERICA

                -against-                21 Cr. 260 (NRB)

MANUEL YATES,

                Defendant.

---------------------------------------------------------------- X

## SENTENCING MEMORANDUM OF MANUEL YATES

MORVILLO PLLC

90 Broad Street
New York, NY 10004
Tel: (646) 831-1531

I.    **PRELIMINARY STATEMENT**

Manuel Enrique Yates respectfully submits this memorandum in advance of his sentencing. Mr. Yates submits that when the Court considers all of the relevant factors—including his history and personal circumstances, how the Federal Sentencing Guidelines overstate the seriousness of the offense in light of the actual conduct the jury found him guilty of, the need for general and specific deterrence, and the harsh conditions in the Essex County jail during his incarceration in this matter—the mandatory minimum more than satisfies the needs of sentencing pursuant to 18 United States Code §3553(a).

II.    **BACKGROUND**

    A.    **Mr. Yates' Upbringing and Work History**

Manuel Enrique Yates was born on December 2, 1984. Manuel did not know his father much at all because Guillermo Yates died in approximately 1987. Manuel's mother was incapable of raising him and thus Manuel's paternal grandparents raised him in Mexico. Manuel remained with his grandparents for approximately 7 years. In 1990 or 1991 Manuel's grandfather passed away and shortly thereafter his grandmother became sick and was hospitalized. As a result, Manuel had to move to California to live with his mother. His stay in California with his mother and brothers was relatively short-lived and within the year Manuel requested to return to Mexico to live with his grandmother.

[redacted] While Manuel does not recall all of the details, Manuel recalls that he attended some counseling as a result of the incident. He tried to work through the issue but in the end never felt comfortable in California. The trauma was too much for him and within a short period of time he contacted his paternal grandmother and

2

requested to return to Mexico. His grandmother had recovered from her hospitalization sufficiently to continue to raise him and brought Manuel back to Mexico. Manuel remained in her care in Mexico until approximately 2000.

Manuel's life in Mexico was erratic. On the one hand, his grandmother cared well enough for him and he felt protected and safe. On the other hand, he was surrounded by violence which caused him to feel unsafe. Nevertheless, Manuel made the best of his situation.

Manuel and his grandmother lived in a small home attached to a grocery store. He attended school and did not have to work as a child. In his free time, he rode his bicycle and spent time with friends. This is when the violence occurred. Manuel recalls that the Mexican Army harassed he and his friends. In one instance, without provocation, members of the Mexican Army grabbed his bicycle and those of his friends and slashed their tires. Other times Manuel observed members of the Mexican Army kill people nearby to him. As a young man, Manuel became exposed to guns and gun violence.

While Manuel was attending high school in Mexico, his life changed again. Although he is not sure why, his mother was deemed to be unfit to care for his brothers and thus, Manuel's grandmother secured custody of them and moved Manuel from Mexico to Arizona to raise he and his siblings. They lived in government subsidized housing.

Manuel did not like living in the United States. He did not speak fluent English and found high school more difficult because of it. In 2003, things took a turn for the worse. Manuel's grandmother became ill from what Manuel later learned was diagnosed as cancer and returned to Mexico for treatment. She left Manuel in charge of his younger brothers with instructions that they attend school and that Manuel finish high school. Despite the difficulty, he remained in school and graduated in May 2004. His grandmother was not alive to witness it because she

passed away one month earlier. The boys remained in the government housing through the end of that summer and then moved.

The brothers moved in with Manuel's paternal aunt. This living arrangement only lasted for a few months. At some point the aunt asked them to leave because she could not handle raising three boys. After that, the boys separated. Manuel was homeless for a period of time and traveled back and forth to Mexico as he could.

Manuel bounced back and forth between Mexico and Arizona for whatever work he could find. In this period, he worked in fast food restaurants, and then took a course on diesel engine maintenance. When he completed his course, he became a traveling diesel engine mechanic. In essence, rather than owning a shop, he traveled to the truck's location to work on the engine. In approximately 2012, Manuel obtained a commercial driver's license and worked as a truck driver. Eventually, Manuel saved up enough to afford his own truck.

Manuel started out doing local runs for a company and then sometime after 2012, Manuel started Paam Trucking LLC. At its height, Paam employed approximately 7 drivers. Manuel both drove and had drivers work with him. He obtained work through a broker and doled it out to his co-workers. Paam, while still in existence, has been dormant since Manuel's arrest.

### B.    Mr. Yates' Family Life

Manuel has had several relationships in his life. In or around 2008, he met and became involved with ▮▮▮▮. He has ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. The relationship between Manuel and ▮▮▮▮ ended because the couple fought too often. Manuel maintains his relationship with ▮▮.

4

After his relationship with ▉▉▉ ended, Manuel became involved with ▉▉. This too was a tumultuous relationship. They were together as a couple for several years before deciding to get married. Typifying the relationship, Manuel and ▉▉ got married and divorced all within a few months. Their relationship resulted in ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉. As the Court will read in the letters attached hereto as exhibit A, Manuel has a strong relationship with his children and has always been an active participant in their lives. Until he was incarcerated Manuel maintains that he paid ▉▉ child support. He is in contact with each of his children while incarcerated.

    C.    **Mr. Yates' ▉▉▉▉▉**

Mr. Yates has ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉. Initially, ▉▉▉▉▉▉ started on weekends while out in nightclubs. However, it began to increase over the course of time. By the time he was arrested, Manuel ▉▉▉▉▉ multiple times per week. Indeed, his ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉.

## II. GUIDELINES CALCULATION

The PSR and the government agree that the offense involved between 4 and 12 kilograms of fentanyl. Both the PSR and the government agree that Mr. Yates' criminal history category is I. The PSR and the government disagree on the offense level, however. The PSR states that the offense level is level 34, criminal history category I, resulting in an advisory Guidelines range of 151-188 months incarceration. See PSR at 27. The government, however, adds 2 points to its

5

calculation of the offense level, deeming it level 36. Level 36 equates to an advisory Guidelines range of 188-235 months incarceration. See government sentencing letter at 2.

Mr. Yates submits that the PSR's offense level and Guidelines range is the appropriate calculation in this case. The government posits that Mr. Yates' offense level should be 2 points higher than the calculation in the PSR's because "the defendant falsely testified under oath in the suppression hearing that he was not the person who reentered his truck during the interaction with law enforcement officers…." See government sentencing letter at 2. This is a conclusory statement and should not be the basis for an increase of 37 months under the low end of the Guidelines range without something more definitive. Indeed, the Guidelines themselves state: "In applying [the two level enhancement for obstruction of justice] in respect to alleged false testimony or statements by the defendant, the court should be cognizant that inaccurate testimony or statements sometimes may result from *confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice*." §3C1.1(2) (emphasis added). The fact that the Court concluded that Mr. Yates, and not one the agents, reentered the truck does not inextricably lead to a determination that Mr. Yates intentionally sought to obstruct justice.

The Court should not apply the 2 point enhancement. As the Court well knows, it concluded that Mr. Yates and not the agent went into the cab of the truck. The Court also knows that Mr. Yates has not wavered from his position and has never admitted that he attempted to mislead the Court. Thus, maintaining his position in the face of the evidence presented at the hearing could lead to the Court to conclude that Mr. Yates' is confused about the facts or that his memory is faulty on this issue and not that his position is the result of a deliberate attempt to obstruct justice.

### III.   ARGUMENT

#### A.   The Applicable Legal Standard

Section 3553(a) of Title 18 of the United States Code provides that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes [of sentencing]." 18 U.S.C. §3553(a). As the Court well knows, it has "very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *United States v. Genao*, 869 F.3d 136, 146 (2d Cir. 2017). "The Guidelines are guidelines—that is, they are truly advisory" and "a district court may not presume that a Guidelines sentence is reasonable." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008). After considering all of the §3553(a) factors, the Court should decide whether to "impose . . . a sentence within the applicable Guidelines range or within permissible departure authority," or "to impose a non-Guidelines sentence." *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005), *abrogated on other grounds by United States v. Fagans*, 406 F.3d 138 (2d Cir. 2005). It is thus appropriate for courts to sentence defendants below the Guidelines range when such a sentence satisfies the purposes of 18 U.S.C. § 3553(a).

#### B.   The Section 3553(a) Factors

In *Rita v. United States*, the Supreme Court summarized the § 3553(a) factors that a sentencing court should consider as: the "(1) offense and offender characteristics; (2) the need for a sentence to reflect the basic aims of sentencing, namely (a) just punishment (retribution), (b) deterrence, (c) incapacitation, (d) rehabilitation; (3) the sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted disparities; and (7) the need for restitution." 551 U.S. 338, 347–48 (2007).

It is a principle of sentencing that courts must consider every "convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*, 562 U.S. 476, 487 (2011) (*quoting Koon v. United States*, 518 U.S. 81, 113 (1996)). "Underlying this tradition is the principle that the punishment should fit the offender and not merely the crime." *Pepper*, 562 U.S. at 487–88 (internal quotations and citation omitted); *see also Genao*, 869 F.3d at 146; *United States v. Jones*, 531 F.3d 163, 170 (2d Cir. 2008) (*en banc*).

Section 3553 (a)(2)(A) provides that the Court should consider the need for the sentence it imposes "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). This section of the Code essentially asks the Court to consider the defendant and his actions holistically, and to "provide just punishment" in light of all the facts known to the Court. *Id*.

Mr. Yates respectfully requests that the Court consider the following factors in determining a just and fair sentence. They are: (1) that the Guidelines overstate the seriousness of Mr. Yates participation in the offense in relation to his actual conduct; (2) that he has been incarcerated for more than 1.5 years during the Covid pandemic; and (3) the need for deterrence.

        **1.**        **The Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law and Provide Just Punishment**

Mr. Yates respectfully submits that the Guidelines overstate the seriousness of his participation in the offense and that a 10 year sentence would satisfy the needs of justice. Per the PSR, the Guidelines in this case equate to 151-188 months incarceration, or 12.5 years on the low end.[1] This is because the weight of the narcotics seized in this matter primarily drives Mr.

---

[1] The government submitted a sentencing letter to the Court on October 28, 2022, in which it stated that the Guidelines are 188-235 months.

Yates's Guidelines calculation. The Guidelines do not take into account what the jury determined was Mr. Yates' actual conduct.

Section 3553(a)(1) states that the Court must consider the "offense and offender characteristics." *Rita*, 551 U.S. 347–48. In this case, the Court should contemplate Mr. Yates' actual conduct, not just the weight of the narcotics at issue. Indeed, whether Mr. Yates' truck contained 1, 10 or 10,000 kilos of fentanyl, his conduct would have been exactly the same—driving a truck—and yet the Guidelines would vary greatly, based only on weight. Thus, as to Mr. Yates' actual conduct, a Guidelines sentence of 151 or 188 would be unduly harsh.

The facts presented and that the jury therefore found in this matter demonstrate that Mr. Yates drove both produce and narcotics across the country. This was the entirety of Mr. Yates participation in the conspiracy, per the evidence adduced at trial. There was no evidence to suggest that Mr. Yates interacted with any undercover agent. There was no evidence that Mr. Yates tried to sell the drugs to anyone. There was no evidence that he collected money for the drugs. There was no evidence of what, if anything, Mr. Yates received for transporting the drugs in question.[2] The government did not prove that Mr. Yates was the mastermind, leader of the scheme, or was even high up in this conspiracy. The evidence upon which the jury found Mr. Yates guilty revealed nothing more than that Mr. Yates drove a suitcase full of narcotics to the Vince Lombardi rest stop in New Jersey where he was promptly arrested. Based only on the weight of the drugs at issue, the Guidelines recommend a sentence of 12.5 to 15.5 years in prison for this participation. To put it plainly, this is a lot of prison time considering that Mr. Yates' actual conduct at issue is fairly minimal.

---

[2] Despite a lack of evidence, the PSR concluded that Mr. Yates was financially motivated to commit the charged crime. See PSR at 28.

There is a mandatory minimum sentence in this case of 10 years imprisonment. While this too seems excessive based on the actual conduct proved at trial, the Court is obviously required to give Mr. Yates a minimum of 120 months in prison. A 10 year sentence for transporting the narcotics at issue is a steep punishment. Adding between 2.5 and 5.5 years onto that, in light of the actual conduct, would be far greater than necessary to comply with the purposes of sentencing.

Subsection (2)(A) of § 3553 provides that the Court should consider the need for the sentence it imposes "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553 (a)(2)(A). This section of the Code essentially asks the Court to consider the defendant and his actions holistically, and to "provide just punishment" in light of all the facts known to the Court. Mr. Yates submits that a 10 year mandatory minimum is punishment enough to satisfy subsection (2)(A) of § 3553.

Based on the conduct at issue, imposing the 10 year mandatory minimum would reflect the seriousness of the offense, promote respect for the law and provide just punishment.

### 2. The Conditions in Essex County Jail Were Overly Harsh Due to the Covid 19 Pandemic

Mr. Yates asks that the Court consider the seriously substandard prison conditions in imposing a just punishment. Mr. Yates was imprisoned for 18 months during the height of the pandemic. He suffered through lock downs, lack of protective gear, lack of cleaning supplies, no family visitation, limited access to the law library, no classes to speak of, and more. As the Honorable Paul A. Engelmayer recently stated after reflecting upon a defendant's experience at the MCC during the COVID-19 pandemic, "Prison is supposed to be punishment, but it is not supposed to be trauma of that nature or close." *United States v. de Jesus*, 20-cr-19 (S.D.N.Y.), July 1, 2020 Sentencing Tr., 36:16-18.

Due to the unusually harsh conditions in the local prisons and jails, numerous courts in the Southern District, including this one,[3] have granted downward variances at sentencing. *See* U*nited States v. Jervis Cirino*, 19-cr-323 (JSR) ("[I]t is fair to say that conditions in the prison system now result in a harshness that is not the norm and that ought to be recognized by the court as a mitigating factor. In effect, you are serving harder time every day you are in the federal prisons."); *see also United States v. Ovalle*, 20-cr-570 (KPF) (taking into consideration the bad conditions at Essex County Jail when sentencing defendant to time-served); *United States v. Juan Carlos Aracena de Jesus*, 20-cr-19 (PEA) (imposing a "substantially downward variance" in large part due to the "dreadful" conditions at the MCC during the COVID-19 pandemic); *United States v. Hector Rivera*, 16-cr-66 (AT) (recognizing that three months during COVID-19 is different than three months in normal times); *United States v. Andre Williams*, 19-cr-782 (RA) (imposing a lighter sentence in part due to the pre-sentence conditions of confinement at the MCC); *United States v. Morgan*, 19-cr-209 (RMB) (discussing the substandard conditions of confinement at both the MCC and MDC and sentencing defendant to time served in part due to the conditions at the MDC); *United States v. Casillas*, 19-cr-863 (VSB) (reducing length of sentence in part based on conditions at MCC during COVID-19 crisis); *United States v. Edwin Gonzalez*, 19-cr-708 (AKH) (granting downward variance in part due to the conditions at the MCC during the COVID-19 pandemic).

Mr. Yates is no stranger to these harsh conditions. He has had no family visitations in 18 months. At certain times during the pandemic, Mr. Yates was locked in his cell for upwards of 72 hours at a time, without even being permitted a shower. In addition, during the pandemic

---

[3] In *United States v. Ocasio Gonzalez*, 21-cr-610 (NRB), the Court granted Mr. Ocasio Gonzalez a downward variance based on the harsh conditions at the MDC where he was incarcerated pending disposition and sentencing.

Essex County jail often served only cold food and, on occasion he did not receive each meal of the day. Mr. Yates further reports that medical treatment was substandard and when he complained about showing the symptoms of Covid, he did not receive medical treatment for several weeks and by that time he was already feeling better. He has had few, if any, programs to avail himself of at Essex County. He suffered through lockdowns for extended periods of time. He lacked cleaning supplies and other basic necessities during the course of the past 18 months. The conditions are subhuman. As such, Mr. Yates asks this Court to consider the harsh conditions of incarceration during the pandemic as an additional reason to impose the mandatory minimum in this case.

### 3. The Need for General and Specific Deterrence

As the Court well knows, another factor in § 3553(a)(2) is to "afford adequate deterrence from criminal conduct" and "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(B) & (C). The first factor contemplates generally deterring the public from committing crimes similar in nature to those in which the defendant has engaged. The second focuses on deterring the defendant himself from committing future crimes. Mr. Yates submits that both general and specific deterrence would be adequately met in this case by the Court imposing a 10 year sentence rather than a 12.5 year or higher sentence.

In the instant case, a mandatory minimum of 10 years satisfies general deterrence. Mr. Yates has been charged with a crime, has proceeded to trial, been convicted and will receive, at least, a 10 year sentence. To the extent that general deterrence even exists in cases such as this, an additional 2.5 years will not send any stronger message to the general public. The 10 year mandatory minimum accomplishes whatever general deterrence can actually be accomplished.

There is no further general deterrence achieved by incarcerating Mr. Yates for any longer than 10 years.

As mentioned above, 18 U.S.C. § 3553(a)(2)(C) focuses on specific deterrence of further criminal conduct by the defendant himself. It requires the Court to consider the need "to protect the public from further crimes of the defendant." In addressing the need for specific deterrence, courts deem these requirements satisfied when the "[e]limination of the defendant's ability to engage in similar or related activities . . . and the substantial loss of assets and income resulting from [his crime] have decreased for the foreseeable future his ability to commit further crimes of the type he was tempted to undertake . . . constitutes a source of both individual and general deterrence." *United States v. Gaind*, 829 F. Supp. 669, 679 (S.D.N.Y. 1993). This sentiment rings true in this case.

Here, there is no need for incarceration greater than 10 years to achieve specific deterrence for Mr. Yates. First, 10 years would be the longest sentence Mr. Yates has ever served, by far. If 10 years is not enough to deter him from engaging in criminal conduct in the future, an additional 2.5 or even 5.5 years will likely not do it either. Second, his participation in the instant offense will separate him from his children for a minimum of 10 years. As the Court knows by reading the letters ▬▬▬▬▬▬▬▬▬▬, he has been involved in their lives and he will lose that privilege for at least 10 years. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. This is a strong deterrent to him because ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. Third, Mr. Yates mentioned during the PSR interview, that he would like to return to Mexico to live the remainder of his life after prison. Thus, when he is able to relocate to Mexico, it is unlikely he will commit further crimes in the United States. Finally, Mr. Yates has lost his truck and his business has ended during the

13

last two years. He has no particular means to commit similar crimes as those at issue in the instant case. Regardless of whether the Court credits this argument or not, it is very unlikely that additional months on top of 10 years will have any more deterrent effect than the 10 years itself. 10 years is a long sentence, particularly in light of the conduct the jury found and the harshness of incarceration during the pandemic. As such, Mr. Yates requests that the Court impose a term of incarceration that does not exceed the mandatory minimum.

IV.    CONCLUSION

For all the foregoing reasons, Manuel Enrique Yates respectfully requests that the Court impose a sentence that contemplates a variance from the Guidelines and impose a sentence of the mandatory minimum. In addition, Mr. Yates requests that the Court recommend to the Bureau of Prisons that he be housed in a federal facility in Arizona, so that he may be near his family, especially his children. Finally, Mr. Yates asks that the Court make a recommendation for him to participate in the BOP's Residential Drug Abuse Program (RDAP).

Dated: New York, New York
       November 7, 2022

/s/
_____
Gregory Morvillo, Esq.
Morvillo PLLC
90 Broad Street
New York, NY 10004
Tel: (646) 831-1531
Email: gm@morvillopllc.com